5/21/19

AO 106 (Rev. 04/10)  Application for a Search Warrant (USAO CDCA Rev. 01/2013)

# UNITED STATES DISTRICT COURT

for the

Western District of Oklahoma

**FILED**

MAY 21 2019

CARMELITA REEDER SHINN, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA.
BY_____ DEPUTY

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*
Premises known as 1536 SW 43rd Street, Oklahoma City,
Oklahoma, the surrounding curtilage, and any
vehicles, garages, and outbuildings thereon.

)
)
)
)
)
)

Case No.  M-19- 272 -BMJ

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____ Western _____ District of _____ Oklahoma _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession of a Mixture or Substance Containing a Detectable Amount of Methamphetamine with Intent to Distribute. |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Joel Hall, Task Force Officer, HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  5/21/19

_____
*Judge's signature*

City and state:  Oklahoma City, Oklahoma

Bernard M. Jones, U.S. Magistrate Judge
*Printed name and title*

AUSA: Thomas B. Snyder

## AFFIDAVIT FOR SEARCH WARRANT

## 1536 SW 43rd Street, OKLAHOMA CITY, OKLAHOMA

## I.   INTRODUCTION

1.   I am an investigative or law enforcement officer within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the U.S. who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.  I have been employed as a Task Force Officer (TFO) since June 2016, and I am presently assigned to the HSI office in Oklahoma City, Oklahoma (hereinafter referred to as HSI Oklahoma City).  As a Task Force Officer, I am authorized to conduct criminal investigations of violations of the laws of the United States and to execute warrants issued under the authority of the United States.  Code.

2.   I am currently employed as an Agent with District Attorney's Office, 21st Judicial District of Oklahoma. I have been a certified peace officer in the State of Oklahoma since September 2009. I currently have over 1,400 hours of continuing education through the Council on Law Enforcement Education and Training (CLEET). I have completed specialized training in narcotic investigations through the Oklahoma Bureau of Narcotics and Dangerous Drugs and the Drug Enforcement Administration. I have conducted numerous complex narcotic investigations with the use of various investigative

techniques including, but not limited to, interviews, physical surveillance, and electronic surveillance.

3.     I have also been involved in numerous narcotic investigations on city, state, and federal levels, which have resulted in apprehension of persons on narcotic and narcotic related charges during my employment as a law enforcement officer, as well as the seizure of drugs, property and monies.

4.     Based upon training, experience, and participation in other investigations involving Controlled Dangerous Substances, your affiant knows the following:

        a.     Drug dealers frequently keep illegal drugs, assets, records, documents related to their narcotics distribution organizations, and monies derived from the sale of illegal narcotics in their houses and in secure locations within those houses such as garages and storage buildings and vehicles parked at those houses, further that these individuals will frequently maintain their residences in the name of other individuals to avoid detection by law enforcement agencies;

        b.     Drug dealers frequently keep illegal drugs, assets, records, documents related to their narcotics distribution organizations, and monies derived from the sale of illegal narcotics in safe houses and in secure locations within the residences such as garages and storage buildings and vehicles parked at those houses where they are not easily

2

detectable by law enforcement officials conducting investigations, further that these individuals will frequently maintain these safe houses in the name of other individuals, also to avoid detection by law enforcement agencies;

c.    Even though those assets, telephones and properties are in alias, or other persons names, the drug dealers continue to use and exercise dominion and control over them;

d.    Drug dealers often maintain on hand quantities of currency in order to maintain and finance their ongoing narcotics business;

e.    Drug dealers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale and distribution of controlled substances, even though such documents may be in code;

f.    Drug dealers commonly provide controlled substances on consignment to their clients; as well as receive illegal drugs on consignment from their own illegal drug sources of supply as part of their illegal operations;

g.    The aforementioned books, records, receipts, notes, ledgers, etc., are commonly maintained where the drug dealers have ready access to them, i.e., homes, automobiles, and safe houses;

h.    It is common for drug dealers to conceal contraband, proceeds of drug sales, records of drug transactions, drug sources, and drug customers in secure locations within residences, garages, storage building, vehicles parked on the property, safes, and safety deposit boxes for ready access and also to conceal such items from law enforcement agencies;

i.    When drug dealers acquire large sums of proceeds from the sale of drugs, they attempt to legitimize their profits;

j.    To accomplish these goals, drug dealers utilize, including but not limited to banks and their attendant services, securities, cashier checks, money drafts, letters of credit, brokerage houses, real estate companies, shell corporations and business fronts;

k.    Drug dealers commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses and/or telephone numbers for their associates in the drug dealers organization, even if said items may be in code;

l.    Drug dealers commonly take or cause to be taken photographs of themselves, their associates, their property and their products, and that these dealers usually maintain these photographs in their possession and at their residence; and

4

m.    Drug dealers frequently maintain firearms to protect their product and proceeds related to the sale of illegal drugs at the residences, stash houses, and/or in vehicles used to distribute illegal drugs.

5.    In my experience, mid to upper level drug suppliers are intelligent, experienced, and very good at hiding how, when and where they conduct their illegal activities. They commonly use multiple aliases both in purchasing property, paying bills, and also when they come into contact with authorities such as law enforcement. They also regularly provide the names of relatives, associates and people who work for them when providing information to bill collector's, such as landlords, banks, mortgage companies, home utility companies (i.e. OG&E, ONG, and City Water and Sewage services). They do this in an attempt to both hide the various assets, monies and contraband they have acquired and/or sell as part of their illegal drug distribution organization; as well as conceal their personal information from law enforcement.

6.    In addition to hiding their identities, and the flow of illegally obtained monies, mid to upper level drug suppliers use the same concealment methods for hiding the location of residences, apartments, storage facilities, businesses and other structures that they own, rent and/or use to "stash" their documents, ledgers of drug sales, narcotics, monies derived from the sale of narcotics and other contraband related to illegal drug distribution.

7.    Also in my experience, mid to upper level drug suppliers have to use some type of record keeping system to maintain a record of the many drug transactions he/she, or the people who work for the illegal drug supplier, may conduct.  This is done to keep a record of customers, when the illegal drugs were sold, the quantity of illegal drugs sold, the amount of money made from selling the illegal drugs, and most importantly, to keep a record of debts owed for illegal drugs provided or received on consignment.  "Fronting" is the street term for giving someone illegal drugs on consignment.  This is a common practice for mid to upper level illegal drug suppliers.  Illegal drugs are provided with the understanding that when that person sells the illegal drugs initially provided by the supplier, the customer will return to the drug supplier with the amount of money that the supplier would normally receive for selling the illegal drugs. The supplier sets a specific amount of time allowed before payment must be made for the illegal drugs.

8.    Mid to upper level illegal drug suppliers are take precautions to prevent being arrested by law enforcement; and to prevent law enforcement from determining their method of operation.  Drug suppliers are aware that once they and/or their method of operation is identified, there is an increased probability of law enforcement seizing their illegal drugs, illegal proceeds, and records of their drug transactions.

9.    The primary method to prevent law enforcement from seizing the above items and conducting arrests, is to utilize multiple locations to store contraband and documents related to their illegal drug distribution activities. In your affiant's experience, mid to upper level drug suppliers at times keep narcotics, drug proceeds and ledgers separate from each other. Many times, this illegal drug related evidence is separated by maintaining these items at completely separate locations, residences, other buildings/dwellings, or with involved co-conspirators.

10.    During this investigation, HSI Oklahoma City TFO's and Agents have used confidential informant (CIs) in order to obtain information and/or conduct controlled purchases of methamphetamine related to the Joshua MAUJER.  All CIs have provided information that has been proven to be accurate based upon agent's personal knowledge of the investigation, law enforcement records, physical surveillance, intercepted conversations, and the actual purchase of methamphetamine from MAUJER.

## II.    PROBABLE CAUSE TO SEARCH 1536 S.W. 43rd Street

11.    Since May 2019, HSI Oklahoma City has been investigating a known multi-pound methamphetamine distributor at the time only identified as "White" but now known as Joshua MAUJER.  A confidential informant (CI)[1]

---

[1] This CI is the subject of pending charges in Oklahoma state court.  The information provided by the CI has generally be found to be truthful and confirmed by law enforcement investigation and other sources.  This CI has purchased approximately 550 grams of methamphetamine from MAUJER in

revealed that MAUJER works in the oilfield industry and maintains a steady job while distributing methamphetamine. CI information also revealed that MAUJER supplies multiple pounds of methamphetamine to other middle level dealers across the state of Oklahoma and typically does the deals out of his work truck described as a white Dodge 2500 bearing Utah license plate (V379AR). On May 9, 2019, HSI Oklahoma City assisted the District 21 Drug Task Force in a "buy walk" operation on a known multi-pound methamphetamine distributor identified as Joshua MAUJER, also known as "White". With the cooperation of the CI, District 21 Task Force Agent Boyd Killman arranged to meet MAUJER to purchase one quarter pound of methamphetamine for $850 dollars in the parking lot of the Family Dollar store at 4606 S. Pennsylvania Avenue located in Oklahoma City, within the Western District of Oklahoma. The CI informed MAUJER that Agent Killman would be driving a dark silver Ford Expedition. The communication about the prices, details and meeting location were between the CI and MAUJER. Those details were then relayed by the CI to Agent Killman.

12. Agent Killman, with audio and video equipment concealed on his person, traveled to the Family Dollar store at 4606 S. Pennsylvania Avenue, the meeting location identified by MAUJER. Law enforcement established

---

April of 2019 as well. Finally, this CI has provided information which proved reliable and led to the arrest of another individual who is currently facing state charges.

surveillance at the Family Dollar in anticipation of the meeting. Agent Killman was driving a dark silver Ford Expedition. At approximately 1159 hours surveillance units observed a maroon Jeep Cherokee bearing Arkansas license plate (852XDK) pull directly up to Agent Killman's vehicle in front of the Family Dollar store. Agent Killman got out of his vehicle and got into the front passenger seat of the Jeep. At approximately 1201 hours, Agent Killman exchanged the $850 dollars for a baggie containing a white crystalline substance that appeared to be methamphetamine. This substance was later field-tested presumptive positive for the presence of methamphetamine and weighed approximately 131 grams.

13.    After the deal MAUJER drove north on Johnston Avenue at a high rate of speed preventing surveillance from following him. Additional law enforcement investigation showed the Jeep involved in the May 9, 2019 "buy walk" had been parked in front of **1536 S.W. 43rd Street** on May 8, 2019. **1536 S.W. 43rd Street** is approximately .3 miles from 4606 S. Pennsylvania Avenue. To get from 4606 S. Pennsylvania Avenue to **1536 S.W. 43rd Street**, one would begin by driving north on Johnston Avenue.

14.    Further investigation into **1536 S.W. 43rd Street** revealed a white Dodge 2500 truck bearing a Utah license plate (V379AR) and a white minivan bearing a Seminole Nation license plate (32065) parked in front. Prior to the May 9, 2019 deal, MAUJER had relayed to Agent Killman, through the CI,

that he would be driving a white dodge truck to the meeting at Family Dollar. Investigators were able to determine that the utilities at **1536 S.W. 43rd Street** checked back to an Albany Hill. Investigators determined through social media that an Albany Hill uses a Facebook account under the user name "Albany Feather". Investigators observed that Albany Hill described herself as being in a relationship with a person with the Facebook user name of "Whitey Maujer". Investigators obtained an Oklahoma driver's license photo for MAUJER. Agent Killman positively identified MAUJER as being the one who sold him the one quarter pound of methamphetamine on May 9, 2019. The Facebook account for "Whitey Maujer" contains pictures that also match MAUJER's driver's license photo. I conducted a search of an online database which also linked a "Joshua Maujer" as tied to the **1536 S.W. 43rd Street**.

15.    Investigators also obtained employment information through the Oklahoma Employment Security Commission (OESC) regarding MAUJER. This information showed that in the fourth quarter of 2018, MAUJER was employed by Superior Supervaks, LLC, a company which provides oilfield services of some kind. A shop for this company was located at 1304 S.E. Grand Boulevard in Oklahoma City.

16.    On May 14, 2019, again with the help of the same CI, HSI Oklahoma City, along with District 21 Drug Task Force, arranged a second "buy walk" from MAUJER for one pound of methamphetamine. Prior to the

operation HSI Oklahoma City conducted surveillance at **1536 S.W. 43rd Street** believed to be MAUJER's residence. At approximately 0500 hours, I observed the white Dodge 2500 (V379AR) parked in front of the residence and the maroon Jeep Cherokee (852XDK), previously used in May 9, 2019 transaction, parked in the driveway. At approximately 0722 hours, MAUJER exited his residence and left the area. Investigators followed MAUJER to his work at the Superior Supervak shop at 1304 S.E. Grand Boulevard. Investigators continued following MAUJER throughout the day in attempt to locate MAUJER's source of supply for the methamphetamine. Later in the day, MAUJER travelled from Oklahoma City to El Reno. While in El Reno, MAUJER was seen visiting the site of an oil rig, which appeared to be consistent with legitimate work for Superior Supervak. At approximately 1821 hours, investigators followed MAUJER from El Reno back to Oklahoma City. At 1826 hours, the CI advised Agent Killman that MAUJER was headed back to the city (Oklahoma City) and the location of the meeting was the Walmart parking lot located at 4420 S. Western Avenue in Oklahoma City.

17.    At approximately 1859 hours, I observed MAUJER driving the white Dodge truck (V379AR) pull up in front of **1536 S.W. 43rd Street**. MAUJER got out wearing a dark blue long sleeve work shirt and blue jeans. MAUJER walked inside. At approximately 1914 hours, I observed MAUJER leave his residence wearing a white short-sleeve shirt and blue jeans.

11

MAUJER walked to the white Dodge 2500 (V379AR) and opened the passenger side door. From my angle, I could not see the front door of the residence, but when I did see MAUJER I observed that he had changed his clothes and was carrying a package of some kind as he walked toward his vehicle. I observed him place that unknown package in the truck before leaving. Based on my observations, I believe that the package I saw him place in his truck had been carried by MAUJER from the residence. At approximately 1917 hours, MAUJER arrived in the Walmart parking lot and met with Agent Killman. The meet happened in MAUJER's vehicle. Agent Killman, with a concealed audio and video recorder, purchased a baggie of a white crystalline substance which appeared to be methamphetamine for $3,000 dollars. MAUJER had the suspected methamphetamine in the car with him. The suspected methamphetamine field-tested presumptive positive for the presence of methamphetamine and weighed approximately 456 grams (~1 lb). During the recording, MAUJER boasted about moving a lot of weight (i.e. many pounds of methamphetamine) and doing a lot of the deals in his work truck. MAUJER also stated that he lives just down the road. The Walmart is approximately 1.1 miles from **1536 S.W. 43rd Street**. After the deal had been made, an Oklahoma Highway Patrol air unit followed MAUJER back to **1536 S.W. 43rd Street**. At approximately 1937 hours, I observed MAUJER pull up to the front of **1536 S.W. 43rd Street** in the white Dodge truck (V379AR), get out of the

vehicle and walk inside. Because MAUJER appeared to carry a package out of **1536 S.W. 43rd Street,** placed it in the vehicle, and then drove straight from **1536 S.W. 43rd Street** to the Walmart, I believe that the drugs MAUJER sold to Agent Killman on May 14, 2019 had been stored inside **1536 S.W. 43rd Street.** Also, because MAUJER returned directly to **1536 S.W. 43rd Street** from the Walmart following the completion of the deal, I believe that MAUJER took the $3,000 cash from the sale into and stored it in his residence.

## CONCLUSION

18.    Based on the foregoing, I believe that there is probable cause to believe that MAUJER is using **1536 S.W. 43rd Street** to facilitate and promote the continued operation of his drug trafficking activities, including storing drugs in that residence and other secure storage locations associated with that

residence and vehicles parked at that residence as well as storing drug proceeds and other evidence and instrumentalities of his drug trafficking operation.

_____
JOEL HALL
Task Force Officer
Homeland Security Investigations


Subscribed and sworn to before me in my presence on this ___21st___ day of May, 2019.


_____
BERNARD M. JONES
United States Magistrate Judge

14

**ATTACHMENT A**

LEGAL DESCRIPTION OF:

1536 SW 43rd Street, Oklahoma City, Oklahoma

The physical description of 1536 SW 43rd Street, Oklahoma City, Oklahoma is a single family dwelling constructed of wood siding, painted a tan color and a light brown brick, with a light brown composition roof.    1536 SW 43rd  Street is the eleventh dwelling on the south side of SW 43rd Street, east of Johnston Drive, and the front door faces north. The physical address of 1536 SW 43rd Street is in the city of Oklahoma City, Oklahoma County, state of Oklahoma.





## ATTACHMENT B

## ITEMS TO BE SEIZED

1. Any and all Controlled Substances;

2. Packaging materials new and used for the distribution of controlled substances;

3. Currency indicative of proceeds from the sale of controlled substances; Records and logs of monies owed, customer lists, sources of supply information and drug shipments accounts receivable in any medium written and/or electronic;

4. Drug paraphernalia used to facilitate drug distribution;

5. United States currency, financial instruments, precious metals, jewelry, and other items of value or proceeds of drug transactions;

6. Telephone and address books, notes, cell phones, personal computers containing telephone and addresses of conspirators or other such records, photographs and recordings, which indicate a criminal association between conspirators;

7. Any and all mobile telephones and bills or receipts relating to the leasing, rental or purchase of the mobile telephones;

8. Information relating to Post Office boxes, third party mail services (for example Mail Boxes Etc.), Safety Deposit Boxes and storage units;

9. Records pertaining to bank accounts, investment accounts, savings accounts



and all financial records relating to the concealing of proceeds or the receipt, investment or disbursement of proceeds, including records of domestic and foreign money transactions or records of the transfer of funds within or into and out of the United States.  This includes the following:

(a) Evidence of income, obtaining, secreting, transferring or the concealment of assets; or the secreting, transfer, concealment or expenditure of money including, cash, precious metals, credit card receipts, wire transfers, money transfers, retained copies of Federal and State Tax Returns, journals, cash receipt books, cash disbursement books, expense records, business ledgers reflecting accounts and notes receivables, account payables, notes payable and closing ledgers, bank ledger sheets, bank statements, bank correspondence, deposits and withdrawal tickets, cancelled checks, loan agreements, notes or mortgages, settlement sheets, contracts, checks issued for loans, repayment records, including records revealing the date, amount and method of repayment (cash or check), checks used to repay loans, records of any liens, loan correspondence files, bank memoranda, purchase invoices, copies of receipts covering payment of fees or expenses, copies of invoices and bills, records of real estate transactions, rentals, purchase or lease agreements for real or personal property, records of the acquisition or sale of vehicles, boats and aircraft, bank passbooks, money drafts, cashier's checks, bank checks, safes,



briefcases, suitcases, storage boxes, safe deposit box records and keys, mutual and money market fund statements, stock or bond purchase records, ledgers, invoices and receipts, receipts or other records pertaining to wire transfers, receipts or other records pertaining to transactions within the United Sates or outside of the United States, including any foreign or off-shore accounts, investments, and trusts; and

(b) Books, records, receipts, personal computers, computer discs and hard drives, printouts, programs, and other items evidencing the obtaining, transfer, laundering, concealment or expenditure of funds or other assets for the purchase of vehicles and real estate or indicating ownership of the vehicles and real estate.

10. Papers, passports, visas or other travel documents, identification cards or papers, driver's licenses, tickets, notes, receipts and other items relating to travel expenditures;

11. Drug records for the organization, in particular, drug ledgers, account books, notes, names or code names or nicknames, or identifying information reflecting customers, amounts of drugs bought and sold, and amounts of money paid, owed or collected;

12. The terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any electrical, electronic, or magnetic form (such as any information on an electronic or magnetic storage device,



3

including CD-ROMs, optical discs, thumb drives, smart cards, memory, calculators, as well as printouts or readouts from any magnetic storage device); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, prints, negatives, videos, photocopies);

13. In order to search for the above describe records that are stored as data capable of being read or interpreted by a computer it may be necessary to seize the following items, subject to the procedure set forth below:

a. Any computer equipment, Cell Phone or storage device capable of being used to commit further or store evidence of the offenses alleged herein;

b. Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

c. Any magnetic, electronic or optical storage device capable of storing data, including but not limited to hard drives, tapes, CD-ROMs, CD-R, CR-RW's, DVD's, optical disks  printer or memory buffers, smart cards, PC cards, electronic notebooks, thumb drives, and memory sticks;

d. Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software;



e.   Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched:

f.   Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

g.   Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data; and

14. All firearms and ammunition.

